# Exhibit A

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT**
**IN AND FOR ST. LUCIE COUNTY, FLORIDA**
**CIVIL DIVISION**

**OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA DEPARTMENT OF LEGAL AFFAIRS,**

Plaintiff

v.

**PFIZER INC., a Delaware Corp., ALBERT BOURLA, and individual,**

Defendant

Case No. 2026CA002277

**INDEX OF DOCUMENTS FILED IN STATE COURT ACTION**

Pursuant to 28 U.S.C. §§ 1446, 1447, Defendant Pfizer Inc. submits the following Index of Documents Filed in *Office of the Attorney General, State of Florida, Department of Legal Affairs*, Case No. 2026CA002277:

1. Docket Sheet
2. Civil Cover Sheet
3. Civil Cover Sheet
4. Complaint, dated October 1, 2026
5. Summons to be Issued – Pfizer Inc.
6. Summons to be Issued – Albert Bourla
7. Summons Issued – Pfizer c/o CT Corporation
8. Summons Issued – Albert Bourla, CEO, Pfizer Inc.

**2026CA002277 - OFFICE OF THE ATTORNEY GENERAL vs. PFIZER INC**

## SUMMARY

| | | |
|---|---|---|
| **Judge:** | **Court Type:** | **Case Type:** |
| LEVIN, STEVEN J | Circuit Civil | ANTITRUST/TRADE REGULATION |
| **Case Number:** | **Uniform Case Number:** | **Status:** |
| 2026CA002277 | 562026CA002277AXXXHC | OPEN |
| **Clerk File Date:** | **Status Date:** | **Waive Speedy Trial:** |
| 10/1/2026 | 10/1/2026 | ☐ |
| **Total Fees Due:** | **Custody Location:** | **Agency:** |
| 420.00 | | |
| **Agency Report Number:** | | |

## PARTIES

| TYPE | PARTY NAME | ATTORNEY |
|---|---|---|
| PLAINTIFF | OFFICE OF THE ATTORNEY GENERAL | 1 PINDER, JENNIFER HAYES (Main Attorney)<br>2 BUTLER, BROOK LEIGH<br>3 BUTLER, VICTORIA ANN |
| DEFENDANT | PFIZER INC | |
| DEFENDANT | BOURLA, ALBERT | |

## EVENTS

| DATE | EVENT | JUDGE | LOCATION | RESULT |
|---|---|---|---|---|
| No Events on Case | | | | |

## CASE DOCKETS

| SEQ# | IMAGE | DIN | DATE | ENTRY |
|---|---|---|---|---|
| 9 | 3 | 9 | 10/1/2026 | SUMMONS ISSUED - ALBERT BOURLA |
| 8 | 3 | 8 | 10/1/2026 | SUMMONS ISSUED - PFIZER INC |
| 7 | | 7 | 10/1/2026 | CIRCUIT JUDGE LEVIN, STEVEN J: ASSIGNED |
| 6 | 3 | 6 | 10/1/2026 | SUMMONS TO BE ISSUED BY CLERK |
| 5 | 3 | 5 | 10/1/2026 | SUMMONS TO BE ISSUED BY CLERK |
| 4 | 49 | 4 | 10/1/2026 | COMPLAINT |
| 3 | 4 | 3 | 10/1/2026 | CIVIL COVER SHEET |
| 2 | 3 | 2 | 10/1/2026 | CIVIL COVER SHEET |
| 1 | | 1 | 10/1/2026 | CASE FILED 10/01/2026 CASE NUMBER 2026CA002277 |

**FORM 1.997. CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

---

## I. CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE NINETEENTH JUDICIAL CIRCUIT, IN AND FOR ST. LUCIE COUNTY, FLORIDA

Office of the Attorney General, State of Florida
Plaintiff

Case # 562026CA002277AXXXHC
Judge ____________

vs.
Pfizer Inc., Albert Bourla
Defendant

---

## II. AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐ $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

## III. TYPE OF CASE

(If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
  ☐ Business governance
  ☐ Business torts
  ☐ Environmental/Toxic tort
  ☐ Third party indemnification
  ☐ Construction defect
  ☐ Mass tort
  ☐ Negligent security
  ☐ Nursing home negligence
  ☐ Premises liability—commercial
  ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
  ☐ Commercial foreclosure
  ☐ Homestead residential foreclosure
  ☐ Non-homestead residential foreclosure
  ☐ Other real property actions

☐Professional malpractice
  ☐ Malpractice—business
  ☐ Malpractice—medical
  ☐ Malpractice—other professional
☒ Other
  ☒ Antitrust/Trade regulation
  ☐ Business transactions
  ☐ Constitutional challenge—statute or ordinance
  ☐ Constitutional challenge—proposed amendment
  ☐ Corporate trusts
  ☐ Discrimination—employment or other
  ☐ Insurance claims
  ☐ Intellectual property
  ☐ Libel/Slander
  ☐ Shareholder derivative action
  ☐ Securities litigation
  ☐ Trade secrets
  ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
  ☐ Residential Evictions
  ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order. Yes ☐ No ☒

**IV. REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☒ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V. NUMBER OF CAUSES OF ACTION:** [ ]
(Specify)

2

**VI. IS THIS CASE A CLASS ACTION LAWSUIT?**
☐ yes
☒ no

**VII. HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
☒ no
☐ yes If "yes," list all related cases by name, case number, and court.

**VIII. IS JURY TRIAL DEMANDED IN COMPLAINT?**
☐ yes
☒ no

**IX. DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
☐ yes
☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Jennifer Hayes Pinder — Attorney or party

Fla. Bar # 17325 — (Bar # if attorney)

Jennifer Hayes Pinder
(type or print name)

10/01/2026
Date

**FORM 1.997. CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

**I. CASE STYLE**

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT**
**IN AND FOR ST. LUCIE COUNTY, FLORIDA**
**CIVIL DIVISION**

**OFFICE OF THE ATTORNEY GENERAL,**
**STATE OF FLORIDA,**
**DEPARTMENT OF LEGAL AFFAIRS,**

Plaintiff

Case # 562026CA002277AXXXHC
Judge ________________

vs.

**PFIZER INC., a Delaware Corp.,**
**ALBERT BOURLA, an individual,**

Defendants

---

**II. AMOUNT OF CLAIM**

**Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.**

☐ $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ Over $100,000.00

## III. TYPE OF CASE

**(If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.**

**CIRCUIT CIVIL**

- ☐ Condominium
- ☐ Contracts and indebtedness
- ☐ Eminent domain
- ☐ Auto negligence
- ☐ Negligence—other
    - ☐ Business governance
    - ☐ Business torts
    - ☐ Environmental/Toxic tort
    - ☐ Third party indemnification
    - ☐ Construction defect
    - ☐ Mass tort
    - ☐ Negligent security
    - ☐ Nursing home negligence
    - ☐ Premises liability—commercial
    - ☐ Premises liability—residential
- ☐ Products liability
- ☐ Real Property/Mortgage foreclosure
    - ☐ Commercial foreclosure
    - ☐ Homestead residential foreclosure
    - ☐ Non-homestead residential foreclosure
    - ☐ Other real property actions
- ☐ Professional malpractice
    - ☐ Malpractice—business
    - ☐ Malpractice—medical
    - ☐ Malpractice—other professional
- ☒ Other
    - ☒ Antitrust/Trade regulation
    - ☐ Business transactions
    - ☐ Constitutional challenge—statute or ordinance
    - ☐ Constitutional challenge—proposed amendment
    - ☐ Corporate trusts
    - ☐ Discrimination—employment or other
    - ☐ Insurance claims
    - ☐ Intellectual property
    - ☐ Libel/Slander
    - ☐ Shareholder derivative action

- ☐ Securities litigation
- ☐ Trade secrets
- ☐ Trust litigation

**COUNTY CIVIL**

- ☐ Small Claims up to $8,000
- ☐ Civil
- ☐ Real property/Mortgage foreclosure
- ☐ Replevins
- ☐ Evictions
  - ☐ Residential Evictions
  - ☐ Non-residential Evictions
- ☐ Other civil (non-monetary)

**IV. REMEDIES SOUGHT (check all that apply):**

- ☒ Monetary;
- ☒ Nonmonetary declaratory or injunctive relief;
- ☐ Punitive

**V. NUMBER OF CAUSES OF ACTION:**

2 Counts for Violations of the Florida Deceptive and Unfair Trade Practices Act (Chapter 501, Part II, Florida Statutes)

**VI. IS THIS CASE A CLASS ACTION LAWSUIT?**

- ☐ yes
- ☒ no

**VII. HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**

- ☒ no
- ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII. IS JURY TRIAL DEMANDED IN COMPLAINT?**

- ☐ yes
- ☒ no

**IX. DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**

- ☐ yes
- ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: /s/ *Jennifer Hayes Pinder*
Attorney or party

Fla. Bar # 017325
(Bar # if attorney)

Jennifer Hayes Pinder
(type or print name)

October 1, 2026
Date

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR ST. LUCIE COUNTY, FLORIDA
CIVIL DIVISION

OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS

Plaintiff,

v.

PFIZER INC., a Delaware Corp., ALBERT BOURLA, an individual,

Defendants.

Case No. _______________

## COMPLAINT

1. “Those people are criminals.”

2. So declared Albert Bourla—the chairman and CEO of pharmaceutical-giant Pfizer Inc.—about Floridians who dared to voice safety concerns with Pfizer’s COVID-19 vaccine publicly. But as is often the case with those who resort to threats and censorship, it was Pfizer and Bourla who were violating the law, not the “criminals” they disparaged.

3. At the height of the COVID-19 pandemic, Florida citizens faced an unprecedented level of uncertainty. They worried about how to protect their loved ones and themselves from a previously unknown virus. Business owners, employees, and consumers alike suffered through a once-in-a-generation economic shock. Many Floridians—like their compatriots across the country—were desperate for a way out of the pandemic.

4. Recognizing this desperation—and the extraordinary opportunity for profit it entailed—Pfizer and Bourla bet big on the company's mRNA COVID-19 vaccine. But that big bet also faced a serious risk: Pfizer could only receive its desired windfall profits if a large segment of Americans, including Floridians, took its novel vaccine.

5. Many were skeptical. The vaccine employed new mRNA technology about which most consumers knew next to nothing. The vaccine had also been developed and tested in an unprecedentedly short period of time, with almost no transparency. Indeed, Pfizer had specifically negotiated with the Federal Government to minimize any transparency or oversight in its development.

6. To mitigate this business risk and ensure windfall profits, Pfizer embarked on a wide-ranging marketing campaign across Florida to drive consumer demand. This marketing blitz included countless media interviews by company executives as well as other mechanisms to communicate directly with Florida consumers. Pfizer spent more than $10 billion on advertising from 2020 to 2023.

7. Pfizer's campaign focused on two principal themes. *First*, Pfizer assured Florida consumers that its vaccine posed no material safety risks. For example, in one nationally televised interview, Bourla asserted that the company had not seen "a single [safety] signal" associated with the vaccine. This emphasis on the purported safety of the vaccine directly responded to widespread public concerns about a pharmaceutical product that had been developed on an unusually accelerated

timeline, with uniquely limited testing and oversight, and employing novel mRNA technology.

8. *Second,* Pfizer claimed that mass vaccination was necessary to stop the transmission of COVID-19. In fact, Defendants insisted that Floridians had a moral duty to take the vaccine to prevent transmission of COVID-19 to those "they love the most," whom "they are putting at risk" if consumers were to remain unvaccinated. During this pressure campaign, Defendants communicated to consumers that the company's vaccine prevented the transmission of COVID-19. As Defendants later acknowledged, this emphasis on transmission "work[ed]" and played a strong role in driving consumer demand.

9. Pfizer was not content merely to promote its own narrative. It also sought to quash any dissent that might impact consumer demand—like calling those who dared to question Pfizer's public claims "criminals."

10. Pfizer's marketing campaign worked: the company brought in more than $80 billion from COVID-19 vaccine sales alone. And the Pfizer executives who spearheaded this campaign profited personally too. Bourla, for instance, received nearly $102 million in compensation from 2020 to 2023. This figure does not include his profits derived from sales of Pfizer stock, whose price was driven up by Pfizer's public marketing campaign, or profits from his self-laudatory 2022 book *Moonshot: Inside Pfizer's Nine-Month Race to Make the Impossible Possible*.

11. As it turned out, however, the "criminals" questioning Pfizer were right. Pfizer's marketing campaign that drove record-breaking profits rested on deception

and falsehoods. While Pfizer was insisting to consumers that the vaccine posed no material safety risks—and while it actively sought to discredit those who said otherwise—Pfizer was aware of data reflecting serious safety risks that it hid from the public.

12. For example, Pfizer knew that data showed its COVID-19 vaccine was connected to myocarditis and pericarditis among minors; had reason to believe its COVID-19 vaccine would cause adverse events for pregnant women and their unborn babies in the first trimester, including miscarriage (a concern expressed by Anthony Fauci, Surgeon General Vivek Murthy, and CDC Director Rochelle Walensky in recently disclosed text messages); and was sitting on thousands of reports of other adverse events including stroke and even death, especially among the elderly.

13. Similarly, while Pfizer hectored consumers about their moral duty to get vaccinated to stop the spread of COVID-19, Pfizer knew that it had not even tested the vaccine's effect on transmission.

14. Pfizer's conduct misled Florida consumers when they were making some of the most sensitive health decisions of their lives. Ultimately, Pfizer's misconduct rests on the paternalistic assumption that Florida consumers could not be trusted with the truth about Pfizer's products. That offensive assumption is anathema to the principles underlying the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

## PARTIES

15. Plaintiff Attorney General James Uthmeier is the Attorney General for the State of Florida.

16. The Attorney General has standing to bring this action in the name of the State of Florida by statute. § 501.207, Fla. Stat.

17. The Attorney General is an enforcing authority of FDUTPA as defined in Section 501.203(2), Florida Statutes, and is authorized to bring this action seeking equitable, injunctive and other statutory relief, and civil penalties, under FDUTPA.

18. Defendant Pfizer is a publicly traded corporation organized in the State of Delaware and with a principal place of business in New York, New York. Pfizer has been registered to do business in Florida since July 1, 1996. Defendant Pfizer may be served through its resident agent CT Corporation System in Plantation, Florida.

19. Pfizer's acts include acts by Pfizer and those of its officers, directors, agents, or employees on Pfizer's behalf and under its authority.

20. Actions or statements by Pfizer executives, including Chairman and CEO Dr. Albert Bourla and Pfizer Board Member Dr. Scott Gottlieb are attributable to Pfizer.

21. Throughout the relevant time period, Defendant Albert Bourla was Chairman and CEO of Pfizer. Bourla's primary residence is in Scarsdale, New York.

## JURISDICTION AND VENUE

22. The Attorney General brings this case, in part, to ensure that Florida consumers receive full and accurate information regarding products that affect their health and the health of their loved ones.

23. This is an action for declaratory relief, injunctive relief, equitable relief civil penalties, attorney's fees and costs, and other statutory relief against Pfizer, brought pursuant to Sections 501.207(1)(a) and 501.207(1)(b), Florida Statutes. Plaintiff brings this action exclusively under the laws of the State of Florida. No federal claims are being asserted and any such claim is expressly disavowed and disclaimed. Plaintiff is not bringing any claim relating to Pfizer's contract with the federal Defense Department or any act under color of such office. 28 U.S.C. § 1442(a)(1). Nor does it bring a "claim for loss" as that term is used in 42 U.S.C. § 247d-6d(a)(1). Plaintiff only brings claims as the head of the Department of Legal Affairs under FDUTPA.

24. This Court has subject matter jurisdiction under FDUTPA. The Attorney General seeks relief in the form of civil penalties in an amount greater than Fifty Thousand Dollars ($50,000.00), exclusive of fees and costs.

25. The Attorney General has reviewed the matters alleged here, and the head of the enforcing authority has determined that this enforcement action serves the public interest.

26. The Attorney General has satisfied all conditions that must be completed prior to filing this suit within four (4) years of this action.

27. Defendant Pfizer is registered to do business in Florida as a foreign corporation, and the cause of action arose in Florida from Pfizer conducting, engaging in, and carrying on a business in Florida. Pfizer also deceived persons within this State arising out of acts or omissions by Pfizer outside this State when at the time Pfizer was engaged in solicitation and service activities within this State and its products were used within this State in the ordinary course of commerce, trade, and use. Pfizer directed substantial marketing funds at Florida consumers.[1] Pfizer also maintains a physical presence in Florida through its "Global Capability Hub" in Tampa, Florida. Therefore, Pfizer is subject to personal jurisdiction in Florida under §§ 48.193(1)(a)(1), (6), Florida Statutes.

28. The Court has personal jurisdiction over Defendant Bourla because he actively and personally participated in the unfair and deceptive marketing of Pfizer's COVID-19 vaccine that affected Florida and its citizens. Bourla himself made many of the unfair and deceptive marketing claims charged in the complaint and the interviews and press releases where he made those statements were published and aired in Florida, and the product he was discussing was distributed and used in Florida. Bourla also had authority to control and in fact controlled, directed, approved, and ratified the harmful and unlawful behavior described in this

[1] *See, e.g.*, Facebook Ad Library, Nos. 580367000437657 (over 1 million impressions, 12% in Florida), 651978930410904 (over 1 million impressions, 7% in Florida), 333803871011770 (over 1 million impressions, 7% in Florida); 996697727543419 (700-800k impressions, 9% in Florida); 3073356369551851 (300-350k impressions, 24% in Florida).

complaint. Defendant Bourla personally and directly benefited from those actions and omissions and the resulting profits, including profits in Florida.

29. Defendants' statutory violations occurred in or affected more than one judicial circuit in the State of Florida, including the Nineteenth Judicial Circuit Court of St. Lucie County. Venue is proper in this Court because the allegations in this Complaint establish that the statutory violations alleged here have occurred, in part, in St. Lucie County because Pfizer's misrepresentations, omissions, and other at-issue conduct were directed at consumers throughout the State of Florida, including those residing in St. Lucie County.

30. Pfizer's actions and statements were widely known throughout Florida, including in St. Lucie County.

31. Statements on Pfizer's website and social media have made misrepresentations to Floridians from the day they were posted continuing to the present.

32. Millions of Floridians heard or read Pfizer's misrepresentations about its COVID-19 vaccine.

33. CDC reports that 6,745,860 Pfizer vaccine doses had gone to Florida as of September 6, 2026.

## ALLEGATIONS COMMON TO ALL COUNTS

34. COVID-19 hit the United States in or around early 2020. When COVID-19 hit, Pfizer took a different approach than other companies to develop a COVID-19 vaccine. Many companies accepted public funding to develop their products in

exchange for additional government oversight, marketing restrictions, and future pricing restrictions. One company, AstraZeneca, pledged to provide its vaccine at cost as long as the crisis lasted, eventually selling approximately the first 1.5 billion doses of its COVID-19 vaccine at not-for-profit pricing. Another company, Moderna, pledged not to enforce patents relating to its mRNA research during the pandemic.

35. Pfizer chose to maintain independence by self-funding its own operation. By September 2020, Pfizer had invested at least $1.5 billion for COVID-19 vaccine development. By self-funding, Pfizer was betting big that the monetary risks would be worth the independence and lack of accountability that it got in return. "[I]f it fails, it goes to our pocket," warned Pfizer Chairman and CEO Dr. Bourla on CBS News's "Face the Nation" (Sept 13, 2020). Pfizer doubled down on this bet, producing a few million vaccine doses before it even received the efficacy or safety data from its vaccine trial.

36. Pfizer's COVID-19 vaccine preliminarily hit the market for individuals 16 years of age and older on December 11, 2020, and for children six months to 15 years of age in the course of 2021 and 2022.

## I. Pfizer Deceived Florida Consumers Regarding the Safety Risks Associated with the Vaccine.

37. From fall 2020 through December 2023, Pfizer engaged in an extraordinary public-relations operation to market its COVID-19 vaccine. It spent more than $25 million on lobbying. It spent over *$10 billion* on total advertising. Bourla and other Pfizer executives embarked on an unprecedented press tour to deliberately market Pfizer's product, appearing in countless interviews on major

networks that aired in Florida or reached it in print, including CBS News' Face the Nation, NBC Nightly News, Fox News, PBS News Hour, Anderson Cooper, CNN, TIME, Bloomberg, ABC, Washington Post, Reuters, Bloomberg, Barron's and countless others. These interviews were covered by local stations throughout Florida, such as WPTV in West Palm Beach (April 15, 2021; Dec. 8, 2021; Nov. 4, 2022), CBS Channel 12 in West Palm Beach (Mar. 15, 2022; Aug. 25, 2021), NBC Channel 8 in Tampa Bay (Nov. 9, 2021), and Channel 28 in Tampa Bay (Nov. 9, 2020), just to name a few.

38. Pfizer's marketing campaign focused on assuring the public its vaccine had no safety risks for any demographic, and on driving up sales by encouraging all consumers to get vaccinated to stop transmission. Both claims were deceptive. And when anyone dared question Pfizer's claims, Pfizer did not hesitate to threaten them: "**Those people are criminals**," Dr. Bourla declared in an interview on November 9, 2021.

39. Pfizer's advertising at times pretended there were no risks at all. For example, Pfizer ran ad campaigns in Florida featuring the tagline "Why will you get vaccinated?" suggesting a moral responsibility to get its vaccine, and the charge "Only you can make it real." Later Pfizer ran ads featuring celebrity influencers peddling a "COVID-19 vaccine" followed by Pfizer's logo. These advertisements and others did not contain the disclaimers or statements of risks typically associated with ethical pharmaceutical advertising.

40. More often, Pfizer engaged in a pattern and practice of claiming there were no material safety concerns. In an open letter to the public in October 2020, Pfizer Chairman and CEO Dr. Bourla dedicated his company to producing a safe vaccine: "The second requirement is to prove that the vaccine is safe. Our internal standards for vaccine safety and those required by regulators are set high. ... **Safety is, and will remain, our number one priority**, and we will continue monitoring and reporting safety data for all trial participants for two years."[2]

41. That same month, Pfizer ran ads in Florida and elsewhere promising to put "Safety ahead of everything."[3] Other ads promised that "Safety is the top priority."[4] Pfizer continued to run similar ads in 2023 and 2024.

42. After committing to Floridians that high safety standards and disclosure were Pfizer's number one priority with its COVID-19 vaccine, Pfizer and its employees, directors, and agents repeatedly misrepresented to Floridians that Pfizer's COVID-19 vaccine was safe.

a. On November 9, 2020, Bourla said on Good Morning America, "We feel very good about the safety" of Pfizer's COVID-19 vaccine and that there were "no safety concerns" reported to Pfizer by a review committee.

---

[2] *An Open Letter from Pfizer Chairman and CEO Albert Bourla*, Pfizer, Oct. 15, 2020 (emphasis added*), available at* https://www.pfizer.com/news/announcements/open-letter-pfizer-chairman-and-ceo-albert-bourla.

[3] *See, e.g.*, Facebook Ad Library No. 477921409832446 (600-700k impressions, 3% in Florida), No. 1558087784398295 (300-350k impressions, 7% in Florida).

[4] *E.g.*, *id.*, No. 2651246228519820 (400-450k impressions, 6% in Florida).

b. On April 1, 2021, Pfizer issued a press release confirming "no serious safety concerns through up to six months following second dose" of the Pfizer COVID-19 vaccine.

c. On August 23, 2021, Bourla declared in an interview with NBC News's Lester Holt that they had "full confirmation" the Pfizer vaccine was "effective and safe."

d. On September 16, 2021, Bourla said in an "open letter" posted on Pfizer's website, "We have been very successful in developing an effective and safe vaccine."

e. On September 20, 2021, Pfizer announced in a press release that "[i]n participants 5 to 11 years of age, the vaccine was safe [and] well tolerated."

f. On November 22, 2021, Pfizer announced in a press release that its COVID-19 vaccine "demonstrated 100% efficacy against COVID-19 in longer-term analysis, with no serious safety concerns identified" in children 12 through 15 years of age.

43. On January 18, 2023, when asked in a CNBC press interview with Sara Eisen about the public's concerns over the safety of Pfizer's COVID-19 vaccine, Bourla said, "We constantly review and analyze the data. We've seen not a single [safety] signal although we have distributed billions of doses." The Food and Drug Administration has defined a "safety signal" as "a concern about an excess of adverse

events compared to what would be expected to be associated with a product's use." A "single well-documented case report can be viewed as a signal."[5]

44. Safety should in fact have been a top concern. But contrary to these well-publicized statements by Pfizer and its executives, Pfizer was aware of many adverse events and safety signals relating to its COVID-19 vaccine.

**A. Pfizer knew its vaccine presented a safety risk for myocarditis and pericarditis, especially among under-18 males.**

45. When Bourla claimed in January 2023 that Pfizer had not seen a single safety signal, Pfizer was aware of a safety signal for myocarditis and pericarditis caused by its COVID-19 vaccine, particularly for males under the age of eighteen. "Myocarditis is inflammation of the heart muscle, and pericarditis is inflammation of the outer lining of the heart."[6] From the start, Pfizer's COVID-19 vaccine was connected to cases of myocarditis and pericarditis.

46. In early 2021, the U.S. military noticed cases of myocarditis in male military members occurring within four days of administration of Pfizer's COVID-19 vaccine, according to a Report to the Committee on Armed Services of the House of Representatives (Sept. 2023).

---

[5] U.S. Department of Health and Human Services et al., *Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment*, Mar. 2005, at 4 (PDF p. 7), *available at* https://www.fda.gov/media/71546/download.

[6] CDC, *Myocarditis and Pericarditis After mRNA COVID-19 Vaccination* (Nov. 3, 2023), *available at* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/myocarditis.html.

47. By June 2021, military doctors found an association between the COVID-19 vaccine and myocarditis in at least 23 military patients who had no known cardiac issues until 12 to 96 hours following a mRNA COVID-19 vaccination, after which they developed myocarditis.

48. When the then-Department of Defense reviewed its health system data for 2021, it found that "[t]hose who were recently vaccinated had a rate ratio that showed their incidences of myocarditis and pericarditis were 2.6 and 2.0 times higher compared to those who were never vaccinated."[7]

49. On March 3, 2021, Israel's Ministry of Health contacted the CDC about myocarditis and pericarditis connected to Pfizer's COVID-19 vaccine: "We are seeing a large number of myocarditis and pericarditis cases in young individuals soon after Pfizer COVID-19 vaccine. We would like to discuss the issue with a relevant expert at CDC."

50. Israel had been tracking myocarditis cases and hospitalizations arising shortly after receipt of Pfizer's COVID-19 vaccine. Pfizer had knowledge of the medical reports in Israel related to its vaccine and myocarditis and pericarditis because Israel agreed to share medical data with Pfizer.

---

[7] Report to the Committee on Armed Services of the House of Representatives, *Department of Defense Report on Cardiac and Kidney Issues in Service Members Prior to and Following the COVID Vaccine Requirement*, Sept. 2023 ("DOD COVID Vaccine Report"), *available at* https://www.health.mil/Reference-Center/Reports/2023/09/29/DOD-Report-on-Cardiac-and-Kidney-Issues-in-Service-Members-Prior-to-and-Following-the-COVID-Vaccine-Requirement.

51. On June 1, 2021, a CDC Advisory Committee on Immunization Practices work group issued a notice stating "that within 30 days of receiving the second dose of either Pfizer or Moderna vaccines, 'there was a higher number of observed than expected myocarditis/pericarditis cases in 16-24-year-olds.'"[8]

52. A Pfizer spokesperson provided a statement that said, "the company is aware of the myocarditis reports, and that 'a causal link to the vaccine has not been established.'"[9]

53. That same day, Israel's Ministry of Health reported that heart inflammation cases among those who received Pfizer's COVID-19 vaccine "were likely linked to their vaccination."[10]

54. After the CDC had received 1,200 reports of heart inflammation relating to the COVID-19 vaccine, in late June 2021, the FDA added a warning about the risk of myocarditis and pericarditis to the Pfizer (and Moderna) COVID-19 vaccine fact sheet.

55. According to a September 2021 FDA briefing document, "safety surveillance reports received by FDA and CDC identified serious risks for myocarditis

---

[8] *See* Elizabeth Cohen, *A link between COVID-19 vaccination and a cardiac illness may be getting closer*, CNN (June 10, 2021), *available at* https://www.cnn.com/2021/06/09/health/myocarditis-covid-vaccination-link-clearer/index.html.

[9] *Id.*

[10] Jeffrey Heller, *Israel sees probable link between Pfizer vaccine and myocarditis cases*, Reuters (June 2, 2021), *available at* https://www.reuters.com/world/middle-east/israel-sees-probable-link-between-pfizer-vaccine-small-number-myocarditis-cases-2021-06-01/.

and pericarditis following administration of the primary series (Dose 1 and Dose 2)" of Pfizer's COVID-19 vaccine.[11]

56. In a March 13, 2022 interview with CBS News' Face the Nation that was aired in Florida, Bourla criticized the State of Florida for not recommending the Pfizer vaccine for healthy children between the ages of five to seventeen.

57. According to a September 2023 presentation to the CDC's Advisory Committee in Immunization Practices, analysis through May 2022 found a safety signal for myocarditis and pericarditis (as well as acute heart attacks and blood clots).

58. At the time of Bourla's January 18, 2023 denial of ***any*** safety signals, the CDC's website reported that "[d]ata from multiple studies show a rare risk for myocarditis and/or pericarditis following receipt of mRNA COVID-19 vaccines. These rare cases of myocarditis or pericarditis have occurred most frequently in adolescent and young adult males, ages 16 years and older, within 7 days after receiving the second dose of an mRNA COVID-19 vaccine (Pfizer-BioNTech and Moderna)."

59. By the end of 2023, the CDC warned of "a causal association between mRNA COVID-19 vaccines (i.e., Moderna or Pfizer-BioNTech) and myocarditis and pericarditis."

60. According to a leaked confidential February 11, 2022 Pfizer document, "[s]ince April 2021, increased cases of myocarditis and pericarditis have been

---

[11] *Vaccines and Related Biological Products Advisory Committee Meeting, Sept. 17, 2021, FDA Briefing Document, Application for licensure of a booster dose for COMIRNATY (COVID-19 Vaccine, mRNA)*, 7, *available at* https://www.fda.gov/media/152176/download.

reported in the United States after mRNA COVID-19 vaccination (Pfizer-BioNTech and Moderna), particularly in adolescents and young adults (CDC 2021)."

61. In September 2021, Pfizer decided to study "how often" its vaccine may cause myocarditis or pericarditis in children by testing 5-16-year-olds for troponin I, an enzyme in the heart muscle that could be an early sign of myocarditis and pericarditis.[12]

62. Pfizer warned child participants that after receiving Pfizer's COVID-19 vaccine, "[y]ou might get chest pain, shortness of breath, or feelings of having a fast-beating, fluttering or pounding heart. You may need to come in to see the study doctor for further assessments if you have these symptoms."[13]

63. Pfizer's deceptive claims about safety are particularly troubling considering its current litigating position about its immunity under the Public Readiness and Emergency Preparedness (PREP) Act. One family's fourteen-year-old died from acute cardiac failure due to myocarditis after receiving Pfizer's COVID-19 vaccine—the safety risk Pfizer publicly claimed did not exist—and Pfizer now claims near complete immunity from liability for her death.[14] Bourla, while claiming in a press interview that there were ***no*** safety signals from the administration of Pfizer's

---

[12] *CT05-GSOP-RF05 7.0 Phase 1/2/3/4 Informed Consent Pediatric Study Template, Phase 2/3 Obtaining Serum Samples for Potential Troponin I Testing (all age groups*, Pfizer (Sept. 13, 2021), 2, *available at* https://www.phmpt.org/wp-content/uploads/2023/10/019736_S488_M5_c4591007-p2-3-older-children-assent-troponin-icd.pdf.

[13] *Id.* at 8.

[14] *See Sookra v. Pfizer Inc.*, No. 25-5200, 2026 WL 2211262 (D.C. Cir. July 31, 2026).

vaccine, failed to tell consumers that Pfizer would take no legal responsibility if its vaccine in fact caused myocarditis and even death.

64. Today, the label for Pfizer's current iteration of its COVID-19 vaccine continues to contain a warning about the risks of myocarditis and pericarditis, contrary to the widely distributed claims of Pfizer and Bourla.

65. While Pfizer publicly acknowledges the risk now, it continues to downplay it in a section of its website called "The Facts: Pfizer Responds to Misinformation & Disinformation." There, Pfizer now finally concedes, "Post-marketing data with authorized or approved mRNA COVID-19 vaccines demonstrate increased risks of myocarditis (inflammation of the heart muscle) and pericarditis (inflammation of the lining outside the heart), particularly within the first week following vaccination. For Pfizer-BioNTech's COVID-19 vaccines, the observed risk is highest in males 12 through 17 years of age."

66. Pfizer's Covid-19 vaccine today is only FDA approved for individuals between 5 years and 18 years of age if they have at least one underlying condition that puts them at high risk for severe outcomes from COVID-19. The Pfizer COVID-19 vaccine is no longer authorized at all for children ages 6 months to 4 years.

**B. Pfizer had reason to believe its vaccine presented safety risks for pregnant women and their babies in the first trimester and had no data alleviating these concerns.**

67. Pfizer's public statements about the safety of its vaccine, and the lack of safety signals, also misled consumers into believing its vaccine was safe for pregnant women and their unborn babies in the first trimester.

68. In a series of text messages in January 2021, Surgeon General Vivek Murthy asked then-director of the National Institute of Allergy and Infectious Diseases, Anthony Fauci, and CDC Director Rochelle Walensky, about the risks of the COVID-19 vaccine for pregnant women in the first trimester. *See* Text Messages between Walensky, Murthy, and Fauci, Authorized for Public Release by Chairman Ron Johnson and Rand Paul.[15] Dr. Fauci responded, "Since many people have significant cytokines storm and fever after the 2nd dose, this theoretically could be associated with miscarriage in the 1st trimester." Dr. Walensky replied, "Definitely a good point, esp after dose two." Dr. Murthy agreed, "That's a really good point re the cytokine storm post second dose."

69. As Fauci, Walensky, and Murthy suggest, both cytokine storms and fever are associated with miscarriage in the first trimester. So a COVID-19 vaccine that caused cytokine storms and fever, as Fauci noted, could be associated with such outcomes. On January 26, 2021, in the same series of text messages, Fauci added, "Animal tox studies did not raise any red flags."

70. Contrary to Pfizer's public claims about the lack of safety risks associated with its COVID-19 vaccine, Pfizer had reason to believe vaccine use in the first trimester presented a safety risk and no data to suggest that vaccine use in the first trimester was safe.

71. In 2020, Pfizer and its partner BioNTech quietly tested its COVID-19 vaccine on pregnant rats from June 29, 2020 to October 12, 2020. According to the

[15] *Available at* https://perma.cc/57SC-YS9E.

lab that performed the research, "[t]he rat genome is comparable to the human genome, which makes rats desirable models for the study of diseases that affect humans."[16]

72. Pfizer did not issue a press release announcing the rat fertility study's findings, even though Pfizer issued press releases and published studies for other animal study findings relating to its COVID-19 vaccine.

73. The rat fertility study's details tell a concerning story. Rats that received BNT162b2, Pfizer's COVID-19 vaccine:

a. Had multiple fetuses with severe soft tissue and skeletal malformations;

b. Did not become pregnant;

c. Failed to implant embryos at more than double (9.77%) the rate of the control group (4.09%);

d. Lost body weight; and

e. Consumed less food.

74. Rats that received other variations of Pfizer's COVID-19 vaccine experienced these issues and others, such as losing their entire litters and delivering stillborn offspring.

[16] Charles River, *Laboratory Rats, available at* https://www.criver.com/products-services/research-models-services/animal-models/rats?region=3616.

75. Upon information and belief, the full findings of Pfizer's rat study were not made publicly available until November 2022. Even then, it only became public because a court forced FDA to release it.

76. By February 28, 2021, Pfizer possessed reports for 458 pregnant women exposed to its COVID-19 vaccine during pregnancy:

a. More than half of the pregnant women (248 cases, or 54%) reported an adverse event from Pfizer's COVID-19 vaccine.

b. More than 1-in-10 women (52) who received Pfizer's COVID-19 vaccine during their pregnancy reported a miscarriage, many within days of vaccination.

c. Nearly all these miscarriages occurred in the first trimester, suggesting miscarriage rates among those receiving the vaccine in the first trimester were significantly higher than 1-in-10.

d. Six women who received Pfizer's COVID-19 vaccine during their pregnancy reported premature deliveries; several babies died. [17]

77. These concerning reports were reinforced by tens of thousands of adverse events Pfizer knew about by April 2022 showing its COVID-19 vaccine was impacting women's reproductive systems—including heavy menstrual bleeding

---

[17] *See* Pfizer, *Pregnancy and Lactation Cumulative Review*, approved Apr. 20, 2021 ("Pfizer Feb. 28, 2021 Pregnancy Data") at 2-5, *available at* https://www.phmpt.org/wp-content/uploads/2023/04/125742_S2_M1_pllr-cumulative-review.pdf.

(27,685); menstrual disorders (22,145); irregular periods (15,083); delayed periods (13,989); absence of periods (11,363); and other reproductive system effects.

78. On February 18, 2021, Pfizer announced "that the first participants have been dosed in a global Phase 2/3 study to further evaluate the safety, tolerability, and immunogenicity of the Pfizer-BioNTech COVID-19 vaccine (BNT162b2) in preventing COVID-19 in healthy pregnant women 18 years of age and older."[18] Like its public statements about safety, Pfizer's press release did not disclose material facts already in its possession showing the risks associated with its COVID-19 vaccine during pregnancy. Pfizer sought to study approximately 4,000 healthy pregnant women. However, Pfizer only enrolled a fraction of this amount (348 mothers and 335 infants) in its study.

79. The study was terminated early, preventing Pfizer from evaluating differences in safety and efficacy between vaccinated pregnant women and unvaccinated pregnant women.

80. Notably, the study was limited to women receiving the vaccination between 24-34 weeks gestation, in the second and third trimester.

81. Pfizer's COVID-19 vaccine is now known by its branded name, Comirnaty. Comirnaty's package insert today states that there "are **<u>no available</u>**

---

[18] Pfizer and BioNTech Commence Global Clinical Trial to Evaluate COVID-19 Vaccine in Pregnant Women (Feb. 18, 2021) *available at* https://www.pfizer.com/news/press-release/press-release-detail/pfizer-and-biontech-commence-global-clinical-trial-evaluate.

**data** on Comirnaty use in pregnant women before 24 weeks gestation to inform about risks for major birth defects and miscarriage" (emphasis added).

**C. Pfizer knew its COVID-19 vaccine was connected to many other adverse events, including stroke and even death among elderly patients.**

82. Pfizer also knew of many other adverse safety events connected to its COVID-19 vaccine, including stroke and even death among elderly patients.

83. Dating back at least to early 2021, Pfizer possessed data presenting significant safety concerns associated with its COVID-19 vaccine even while it made public statements claiming its COVID-19 vaccine was safe.[19] This Adverse Event Data was collected by Pfizer but was not released to the public. It only came to light much later, when it was disclosed pursuant to a court order in hard-fought FOIA litigation.

84. The FDA defines an adverse event as "any undesirable experience associated with the use of a medical product in a patient."[20]

85. The FDA and CDC co-manage the Vaccine Adverse Event Reporting System (VAERS), a national early warning system to detect possible safety problems in U.S.-licensed vaccines.

---

[19] *See* Worldwide Safety and Pfizer, *5.3.6 Cumulative Analysis of Post-Authorization Adverse Event Reports of PF-07302048 (BNT162B2) Received Through 28-Feb-2021*, approved Apr. 30, 2021 ("Pfizer Feb. 28, 2021 Adverse Event Data"), *available at* https://phmpt.org/wp-content/uploads/2022/04/reissue_5.3.6-postmarketing-experience.pdf.

[20] FDA, *What is a Serious Adverse Event?*, content current as of May 18, 2023, *available at* https://www.fda.gov/safety/reporting-serious-problems-fda/what-serious-adverse-event.

86. VAERS is a passive reporting system that relies on reports submitted by patients and health care providers and thus is believed to miss many potential side effects.

87. Separate from VAERS, Pfizer maintained its own adverse events database that collected adverse events reports from many sources all in one place.

88. Pfizer's adverse events database contained more adverse event data than VAERS because it included both information in VAERS and information not in VAERS.

89. Pfizer did not publicly release adverse events data from its database.

90. The Pfizer Feb. 28, 2021 Adverse Event Data document was only obtained through FOIA litigation and at a much later date than February 28, 2021.

91. As of February 28, 2021—about 10 weeks after Pfizer obtained emergency use authorization—Pfizer's adverse events database already contained 158,893 adverse events (from 42,086 case reports) from its COVID-19 vaccine.[21]

92. Days before Pfizer Chairman and CEO Dr. Bourla denied any safety signal, the CDC's and FDA's "surveillance system flagged a possible link between the new Pfizer-BioNTech bivalent COVID-19 vaccine and strokes in people aged 65 and over."[22]

---

[21] Pfizer Feb. 28, 2021 Adverse Event Data, at 6.

[22] *See* Ben Leonard and Lauren Gardner, *CDC, FDA see possible link between Pfizer's bivalent shot and strokes*, POLITICO (Jan. 13, 2023) *available at* https://www.politico.com/news/2023/01/13/cdc-fda-pfizer-bivalent-vaccine-possible-strokes-00077933.

93. An FDA study found that individuals 85 years or older who received both a flu vaccine and Pfizer's COVID-19 vaccine had a 20 percent increase in the risk of stroke.

94. Pfizer inadequately studied its vaccine's effects on the elderly. When Pfizer sought approval for a third shot—a "booster"—for its COVID-19 vaccine, it requested approval to vaccinate individuals 16 years of age and older, including the elderly. But Pfizer only tested the booster shot on 12 trial participants who were in the 65- to 85-year-old age range. Pfizer should not have represented that the booster was "safe" for 65- to 85-year-olds after only testing 12 trial participants in that age range.

95. As of February 28, 2021, Pfizer's database contained 1,223 fatalities after taking Pfizer's COVID-19 vaccine, although Pfizer did not make causality findings.[23]

96. While Pfizer was too busy to make causality findings in the 1,223 fatalities it had identified, others took a closer look at such cases. An expert review by the Norwegian Medicines Agency published on May 19, 2021, determined that "[a]mong 100 reported deaths, a causal link to the [Pfizer COVID-19] vaccine was considered probable in 10 cases, possible in 26 and unlikely in 59. Five were unclassifiable."[24] Extrapolating from this study that a causal link was probable or

---

[23] Pfizer Feb. 28, 2021 Adverse Event Data, at 7.

[24] *See* Wyller TB, Kittang BR, Ranhoff AH, Harg P, Myrstad M. *Nursing home deaths after COVID-19 vaccination*. TIDSSKR NOR LEGEFOREN 2021;141. doi:10.4045/tidsskr.21.0383, *available at*

possible in 36% of cases, Pfizer should have been aware of several hundred vaccine-related deaths within just the first 10 weeks of the vaccine preliminarily hitting the market. By December 2021, New Zealand's health authorities had also linked multiple deaths to Pfizer's COVID-19 vaccine.

97. Pfizer was receiving so many adverse event reports that it had to hire 600 additional full-time staff and expected to hire 1,800 more by June 2021.[25]

98. That was just the tip of the iceberg. Pfizer did not know "the magnitude of underreporting,"[26] but significant underreporting was likely—a systematic review of 37 studies in 2006 concluded the median under-reporting of adverse drug reactions to spontaneous reporting systems was 94%.

99. Pfizer's public representations that its COVID-19 vaccine did not have any safety concerns misled the public and omitted the adverse events data it possessed.

100. To this day, Pfizer continues to make public statements regarding its COVID-19 vaccine that do not accurately reflect the safety of that vaccine.

## II. Pfizer Deceived Florida Consumers By Claiming Everyone Needed to Get Vaccinated to Stop Transmission.

101. Despite its knowledge of these safety risks, Pfizer pressured *all* consumers to get a COVID-19 vaccine. From 2020 to at least [redacted] Pfizer engaged in

---

https://tidsskriftet.no/en/2021/05/originalartikkel/nursing-home-deaths-after-covid-19-vaccination.

[25] Pfizer Feb. 28, 2021 Adverse Event Data, at 6.

[26] *Id.* at 5.

a pattern and practice of deceiving Florida consumers by claiming they needed to get vaccinated to stop transmission.

102. Bourla warned Floridians on multiple occasions that not receiving a COVID-19 vaccine would affect the lives of those around them, thus implying that Pfizer's COVID-19 vaccine prevented transmission.

a. In a December 14, 2020 interview with CNBC's "Squawk Box" Today, Bourla said: "I repeat once more, that this choice not to vaccinate will not affect only your health or your life. Unfortunately, it will affect the lives of others and likely the lives of the people you love the most, who are the people that usually you are in contact with."

b. In an interview with Bloomberg published January 28, 2021, Bourla said: "What I would say to people who fear the vaccine is that they need to recognize that the decision to take it or not will not affect only their own lives. It will affect the lives of others. And most likely it will affect the lives of people that they love the most, who are the people that they socialize the most with."

c. In a June 2021 interview with CVS' News' Jan Crawford, Bourla said: "I try to explain to them that the decision to vaccinate or not is not only going to affect only your life. ... But unfortunately will affect the health of others and likely will affect the health of people you like and you love the most. ... When you try to explain that their fear could stand

in the way of protecting their loved ones, I think this is the argument that mostly works."

103. In an Atlantic Counsel interview published November 9, 2021, Bourla repeated: "The only thing that stands between the new way of life and the current way of life, frankly, is the hesitancy to get vaccinated, the people that are afraid to get the vaccines, and they create issues not only for them. Unfortunately, they are going to affect the lives of others and, frankly, the lives of the people that they love the most because they are putting at risk the people that they hug, they kiss, [and] they socialize with."

104. On December 8, 2021, a Pfizer press release quoted Bourla in a manner that again suggested that Pfizer's COVID-19 vaccine prevented transmission: "Ensuring as many people as possible are fully vaccinated with the first two dose series and a booster remains the best course of action ***to prevent the spread of COVID-19***" (emphasis added).

105. In an interview on CBS News's Face the Nation on March 7, 2021—published in Florida—Pfizer Board Member Dr. Scott Gottlieb also represented to Florida consumers that Pfizer's COVID-19 prevented transmission: "And final point, I mean, some of the optimism is also being driven by growing science, suggesting that these vaccines, all the vaccines not only prevent COVID disease, prevent symptoms, but also prevent transmission. So they could have a dramatic effect on reducing the overall tenor of the epidemic."

106. Pfizer even used comic books targeted at children to suggest that the vaccine prevented transmission. Pfizer partnered with Marvel to produce an "Avengers"-themed comic book that called individuals waiting for a Pfizer COVID-19 vaccine "Everyday Heroes." That was published in January 2023.[27]

a. According to one of the characters in the Pfizer comic book, "it's also important for entire communities to come together and help fight the threat." "And that's exactly what we're doing today!" says another character. As the group heads to the examination room to get their Pfizer COVID-19 vaccinations, the first character announces, "The Avengers are doing their part to help keep us safe. Now it's time for us to do ours."[28]

b. One of the final pages reinforces the need for individuals to get a Pfizer COVID-19 vaccine to protect the community. "Everyday heroes don't wear capes! But they do wear a small bandage on their upper arm after they get their latest COVID-19 vaccination—because everyday heroes are concerned about their health. And they're people who choose to unite with their communities and do their part to help protect against COVID-19."[29]

---

[27] *See* Avengers: Everyday Heroes, 2022 (Published Jan. 2, 2023), *available at* https://www.marvel.com/comics/issue/107027/everyday_heroes_2022_1.
[28] *Id.* at 13.
[29] *Id.* at 15.

c. Pfizer released the "Everyday Heroes" comic book as a digital comic and provided print editions at some offices and retail locations around the country in 2023.

107. On November 9, 2023, Bourla posted on X, "Three years ago today, we were able to share with the world the joyous news that our #COVID19 vaccine was highly effective in *preventing disease*" (emphasis added).

108. To recap, on many occasions, Pfizer represented to Floridians and their children that Pfizer's COVID-19 vaccine prevented infection and transmission by claiming that not getting vaccinated threatened the lives of loved ones with whom a person closely interacted. As Bourla explained to CBS News' Jan Crawford on June 15, 2021, this argument "work[ed]" the best at getting ordinary, healthy Americans to buy in to what Pfizer was selling.

109. Pfizer made these representations and pushed the idea that its COVID-19 vaccine could prevent transmission of COVID-19, even though it had no basis for the representation since Pfizer never tested its COVID-19 vaccine to determine whether it could prevent transmission of COVID-19.

110. Contrary to Pfizer's widely broadcasted public claims, and as Pfizer and Bourla well knew, the FDA reported in December 2020 that there was no "evidence that the vaccine prevents transmission of SARS-CoV-2 from person to person."

111. According to Pfizer's trial protocol, evaluating transmission was not an objective of the trial.

112. Pfizer has since publicly conceded that it did not test its COVID-19 vaccine on stopping transmission. When asked, "Was the Pfizer COVID vaccine tested on stopping the transmission of the virus before it entered the market?" Pfizer's Director of International Developed Markets Janine Small responded, "No."[30]

**III. Pfizer's deceptive marketing and profit-seeking led to record-setting profits and market control, turning a $1.5 billion R&D investment into over $80 billion in revenue.**

113. All these marketing efforts paid off handsomely for Pfizer, turning its $1.5 billion R&D investment into over $80 billion in revenue.

114. Pfizer's vaccine dominated the market for COVID-19 vaccines, cornering nearly "70% of the U.S. and European markets."[31]

115. Market share led to outsized profits. Pfizer's Annual Reviews reported revenue jumped to $41.7 billion in 2020, to $81.3 billion in 2021, and to a record-setting $100.3 billion in 2022, before dropping back to $58.5 billion in 2023. Pfizer's annual profits jumped from $9.1 billion in 2020, to $22 billion in 2022, to $31.4 billion in 2023. And Pfizer's COVID-19 vaccine made up 38% of Pfizer's record-setting total revenue in 2022.

---

[30] Frank Chung, *Pfizer did not know whether COVID vaccine stopped transmission before rollout, executive admits*, news.com.au, Oct. 13, 2022, *available at* https://www.news.com.au/technology/science/human-body/pfizer-did-not-know-whether-covid-vaccine-stopped-transmission-before-rollout-executive-admits/news-story/f307f28f794e173ac017a62784fec414.

[31] *See* Arthur Allen, How Pfizer Won the Pandemic, Reaping Outsize Profit and Influence, KFF HEALTH NEWS (July 5, 2022), *available at* https://kffhealthnews.org/public-health/pfizer-pandemic-vaccine-market-paxlovid-outsize-profit-influence/.

116. As he flew around the country doing interviews, Bourla staked out a personal interest in Pfizer's profit seeking. In August 2020, Bourla implemented a plan to sell some of his Pfizer stock if it reached a pre-determined price just one day before Pfizer issued a press release about Phase 1 safety data reporting it was on track to seek regulatory review that fall. Bourla's stock reached the pre-determined price and sold on November 9, 2020, the same day Pfizer announced positive news about its clinical trials. Bourla made $5.6 million from his November 9, 2020 Pfizer stock sale alone. An insider-trading expert called the sequence of events involving Bourla's stock sale "very suspicious," "wholly inappropriate," and "troubling."[32]

117. From 2020 to 2023, Bourla made $101,804,242.00 in total compensation from Pfizer, according to Pfizer's Proxy Statements.

118. In 2021, Thomas Frieden, director of the CDC under former President Barack Obama, condemned Pfizer's actions during the COVID-19 pandemic as nothing less than "war profiteering." In November 2021, Amnesty International accused Pfizer of "misleading" the public and putting "profits before people" through its price-gouging actions.

119. One way Pfizer cornered such a large market share was through covert targeting of its competitors' products. During the early years, AstraZeneca provided its vaccine at cost. By contrast with Pfizer's record-shattering profits, AstraZeneca's

---

[32] *See* Tom Dreisbach, Pfizer CEO Sold Millions In Stock After Coronavirus Vaccine News, Raising Questions, NPR (Nov. 11, 2020), *available at* https://www.npr.org/2020/11/11/933957580/pfizer-ceo-sold-millions-in-stock-after-coronavirus-vaccine-news-raising-questio.

overall profit margins *fell* during the pandemic as a result of providing its vaccine at cost price. Countering this threat, Pfizer funded presentations to medical professionals suggesting that rival COVID-19 vaccines from AstraZeneca could cause cancer.

120. Another way Pfizer protected its profiteering and market share was by pushing social media companies to silence speech across the political spectrum critical of Pfizer.

a. Pfizer-funded and Pfizer-connected entities pushed to censor speakers calling for patent and intellectual property sharing that would have allowed generic vaccines to reach third-world countries *and* simultaneously tried to shut down speakers criticizing the safety of Pfizer's product. Pfizer simultaneously promoted its preferred message through advertising. An ad it ran on Floridians' social media in 2021, for example, warned that "The TRIPS IP waiver" would have "unintended consequences" and would "compromise vaccine safety."[33]

b. On July 19, 2021, in an interview on CNBC, Pfizer Board Member Dr. Scott Gottlieb claimed social media companies had an "obligation" and an "affirmative responsibility" to protect Pfizer's profiteering by preventing the spread of such "misinformation" on their platforms.

[33] *See* Facebook Library Ad ID 568393367521777 (noting 600k-700k impressions, including in Florida).

Gottlieb contacted social media platforms to request censorship of COVID-19-related posts.

121. Having cornered 70% of the vaccine market, and coming off record-setting revenue in 2022, Pfizer announced plans to hike its prices in 2023. Pfizer nearly quadrupled the price of its COVID-19 vaccine, from $30 a dose to a range of $110 to $130 a dose. Today, the private-sector cost of Pfizer's Comirnaty vaccine has reached the price of $169.84 per dose.

122. Senators blasted the "pure and deadly greed" behind Pfizer's price hike in a letter to Pfizer in December 2022. They estimated that the $130 per dose price would be a **10,000 percent markup** over the cost of production. Even Bourla publicly recognized—before Pfizer had acquired a dominant share of the market—that imposing "huge prices" for the vaccine "would be unethical." But as the Senators noted, "that is exactly what the company is doing, and the impact ... will fall hardest on the uninsured and underinsured."[34]

123. Today Pfizer's COVID-19 vaccine is available only to individuals 65 years of age and older, or individuals 5 years through 64 years of age with at least one underlying condition that puts them at high risk for severe outcomes from COVID-19. It is no longer authorized at all for children ages 6 months to 4 years.

[34] Sens. Warren & Welch, Letter to Pfizer on Vaccine Price Hikes (Dec. 12, 2022), *available at* https://www.warren.senate.gov/wp-content/uploads/media/doc/2022.12.12%20Letter%20to%20Pfizer%20on%20Vaccine%20Price%20Hikes.pdf.

## IV. Pfizer Concealed Its Unlawful Marketing Practices by Publicly Declaring a Commitment to Transparency While Privately Concealing the Data.

124. Reinforcing its public marketing about the vaccine's safety and impact on transmission, Pfizer repeatedly assured Floridians that it provided transparency on its data.

125. Unlike the other companies involved in the race for a vaccine back in 2020, Pfizer declined vaccine-development funding from the government's Operation Warp Speed. Pfizer continued to distance itself from Operation Warp Speed when it announced the results of its COVID-19 vaccine trials: "We were never part of the Warp Speed," proclaimed Pfizer's senior vice president and head of vaccine research and development.[35]

126. In a press interview on CBS News' Face the Nation in September 2020—that like others aired in Florida—Pfizer's Chairman and CEO Dr. Bourla told consumers that Pfizer declined government funding to "liberate" Pfizer's scientists from government strings: "But the reason why I did it was because I wanted to liberate our scientists from any bureaucracy. ***When you get money from someone that always comes with strings. They want to see how we are going to progress, what type of moves you are going to do. They want reports. I didn't want to have any of that***" (emphasis added).

[35] Philip Bump, *No, Pfizer's apparent vaccine success is not a function of Trump's 'Operation Warp Speed,'* THE WASHINGTON POST (Nov. 9, 2020), *available at* https://www.washingtonpost.com/politics/2020/11/09/no-pfizers-apparent-vaccine-success-is-not-function-trumps-operation-warp-speed/.

127. Because Pfizer did not accept government funding for developing its vaccine, "[t]he government had limited visibility into what was happening at Pfizer."[36] "Pfizer worked 'at arm's length' compared with the other companies in Operation Warp Speed," the scientific lead of Operation Warp Speed recounted.[37]

128. Pfizer got three things in return for funding its own research and development project. *First*, Pfizer retained exclusive control over public statements about its vaccine. When it sold doses to the US government Pfizer negotiated "the right, but not the obligation, to prepare and submit scientific publications and release information to the public about its COVID-19 development program, without the Government's consent or involvement."[38] It then engaged in an extraordinary public-relations operation to market its COVID-19 vaccine. *See supra* Parts I-II.

129. *Second*, Pfizer retained exclusive control over pricing. Pfizer's independence from Operation Warp Speed allowed it to demand a "tailor-made contract" that let Pfizer "retain almost all of its intellectual property rights and forgo the taxpayer protection clauses found in most government contracts that fund

---

[36] Sydney Lupkin, *The U.S. Paid Billions To Get Enough COVID Vaccines Last Fall. What Went Wrong?* NPR (Aug. 25, 2021), *available at* https://www.npr.org/sections/health-shots/2021/08/25/1029715721/pfizer-vaccine-operation-warp-speed-delay.

[37] *Id.*

[38] *See* Statement of Work for COVID-19 Pandemic-Large Scale Vaccine Manufacturing Demonstration, July 21, 2020 ("Pfizer Statement of Work"), ¶ 11.11.

inventions."[39] This meant "forgoing leverage to use if [Pfizer] engage[d] in price gouging down the road."[40] That's exactly what Pfizer did. *See supra* Part III.

130. *Third*, Pfizer got secrecy. Pfizer's refusal to take government research-and-development funding gave it more bargaining power when it sold doses to the US government. Thus, Pfizer negotiated a manufacturing contract that required the United States government to keep Pfizer's confidential information secret for 10 years. Higher protections applied to Pfizer's trade secret information, which the government promised to keep "in confidence in perpetuity."

131. Even so, Pfizer engaged in a deceptive pattern and practice of claiming transparency. On December 14, 2020, the day Americans began receiving Pfizer's COVID-19 vaccine, Bourla said in an interview with CNBC's "Squawk Box" Today: "This is a vaccine that was developed without cutting corners from a company with 171 years of credentials. This is a vaccine that was developed in the spotlight in the daylight, with all the data being put in servers."

132. On September 16, 2021, Bourla said in an open letter published on Pfizer's website, "We have stayed true to our commitment of full transparency without selectively cherry-picking data." To this day, Pfizer claims "a longstanding commitment to ensure public access to clinical trial data."

---

[39] *See* Sydney Lupkin, *The U.S. Paid Billions To Get Enough COVID Vaccines Last Fall. What Went Wrong?* NPR (Aug. 25, 2021); *see also* Pfizer Statement of Work, ¶¶ 7.1, 7.2.

[40] *See Pfizer's Coronavirus Vaccine Supply Contact Excludes Many Taxpayer Protections*, NPR (Nov. 24, 2020), *available at* https://www.npr.org/sections/health-shots/2020/11/24/938591815/pfizers-coronavirus-vaccine-supply-contract-excludes-many-taxpayer-protections.

133. At all times relevant to this action, and contrary to its representations, Pfizer has willfully concealed, suppressed, and omitted safety data relating to its COVID-19 vaccine.

134. Pfizer initially said it would provide researchers with access to patient-level data and full clinical study reports 24 months after study completion.

135. Pfizer initially estimated that it would complete the study by January 27, 2023, so the data would not be available until 2025. But Pfizer pushed the completion date back to February 2024 because of a late vaccination of a single study participant (out of 44,000 participants).[41]

136. Scientists were outraged that they still could not review Pfizer's COVID-19 study data. As the British Medical Journal editorialized in January 2022:

> Pharmaceutical companies are reaping vast profits without adequate independent scrutiny of their scientific claims. The purpose of regulators is not to dance to the tune of rich global corporations and enrich them further; it is to protect the health of their populations. We need complete data transparency for all studies, we need it in the public interest, and we need it now.[42]

137. Fed up with Pfizer's delays, researchers turned to the FDA for the data. FDA should have made Pfizer's "safety and effectiveness data and information, … adverse reaction reports, product experience reports, [and] consumer complaints …

[41] *See* Jennifer Block, *COVID-19: Researchers face wait for patient level data from Pfizer and Moderna vaccine trials*, British Medical Journal, July 12, 2022, *available at* https://www.bmj.com/content/378/bmj.o1731.

[42] *See COVID-19 Vaccines and Treatments: we must have raw data, now*, British Medical Journal, 2022:376 (Jan. 19, 2022), *available at* https://www.bmj.com/content/376/bmj.o102.

available for public disclosure" no later than August 23, 2021. *See* 21 C.F.R. 601.51(e). But the FDA did not make the safety and effectiveness data for Pfizer's COVID-19 vaccine immediately available.

138. Because full data was not available, Public Health and Medical Professionals for Transparency in America ("PHMPTA") submitted a FOIA request to the FDA for all data and information for Pfizer's COVID-19 vaccine.[43]

139. The FDA denied expedited processing of PHMPTA's FOIA request and claimed in litigation that it would take 55 years—until 2076—to produce all the responsive documents.[44] Pfizer's rights to review documents before their release and to identify withholdable documents likely influenced the FDA's decision to deny expedited processing of PHMPTA's FOIA request and propose a 55-year production timeline.

140. In January 2022, a federal judge rejected the FDA's arguments and ordered the FDA to instead produce 55,000 pages per month.[45]

141. FDA initially claimed to have finished production of responsive documents about Pfizer's vaccine on December 19, 2023.[46] *Id.* But the court later

[43] *Pub. Health & Med. Pros. for Transparency v. Food & Drug Admin.*, No. 4:21-CV-1058-P, Doc. 1-1 (Aug. 27, 2021 request).

[44] Jenna Greene, *Wait what? FDA wants 55 years to process FOIA request over vaccine data*, REUTERS (Nov. 18, 2021), *available at* https://www.reuters.com/legal/government/wait-what-fda-wants-55-years-process-foia-request-over-vaccine-data-2021-11-18/.

[45] *Pub. Health & Med. Pros. for Transparency v. Food & Drug Admin.*, No. 4:21-CV-1058-P, 2022 WL 90237, at *2 (N.D. Tex. Jan. 6, 2022); *see also id.*, Doc. 101 (noting the court had rejected FDA's initial request for "up to seventy-five years to produce the documents").

[46] *Id.*, Doc. 75.

learned that this was not true: FDA had not produced the Emergency Use Authorization (EUA) file for Pfizer's vaccine. The Court noted: "The FDA attempted to hide the file's existence until roughly eight months **after** it had 'completed production.'"[47] In a January 2025 order ruling FDA must produce the file by June 2025, the court observed: "These documents should have been produced months ago under the Court's previous orders and the undersigned is exhausted by the FDA's continued attempts" at noncompliance.[48]

142. Upon information and belief, Pfizer used its confidentiality agreements with the United States government to delay FDA's release of documents and influence its noncompliance with the court.

## THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

143. Section 501.204(1), Florida Statutes, states that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

144. Section 501.203(8), Florida Statutes, defines "[t]rade or commerce" as:

> the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

[47] *Id.*, Doc. 108 at 6.

[48] *Id.* at 1-2 ("Information is the currency of democracy—and information is useful only if it is timely.").

145. At all times relevant here, and in the ordinary course of business, Pfizer engaged in the conduct of trade or commerce, as that term is defined by § 501.203(8), Florida Statutes.

146. Pfizer's misrepresentations about its COVID-19 vaccine violated FDUTPA regardless of whether an individual consumer decided to receive or forgo Pfizer's COVID-19 vaccine.

147. As the enforcing authority, the Attorney General "may bring [a]n action to enjoin any person who has violated, is violating, or is otherwise likely to violate, this part." § 501.207(1)(b), Fla. Stat.

148. Under FDUTPA, "'[v]iolation of this part' means any violation of this act or the rules adopted under this act and may be based upon … [a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." § 501.203(c)(3), Fla. Stat.

149. The provisions of FDUTPA shall be "construed liberally" to promote and "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202, Fla. Stat.

150. Under FDUTPA, an individual defendant may be individually liable for FDUTPA violations if the individual (i) participated directly in the deceptive or unfair acts or practices, (ii) controlled the deceptive or unfair acts or practices, or (iii) possessed the authority to control the deceptive or unfair acts or practices and had actual or constructive knowledge of such acts or practices.

151. Florida has repeatedly sued Pfizer for violations of FDUTPA and other statutes. While Pfizer engaged in its unlawful marketing practices involving the COVID-19 vaccine, it was subject to obligations to the Attorney General under numerous consent judgments with Florida that prohibited precisely that sort of consumer deception.

## COUNT I

### Violations of FDUTPA: Safety Representations and Omissions
### Chapter 501, Part II, Florida Statutes
### (Against All Defendants)

152. Plaintiff adopts, incorporates, and re-alleges paragraphs 1 through 151 as if fully set forth here.

153. Beginning in 2020 and continuing until the present, through the actions and related business practices set forth in this Complaint, Defendants engaged in representations, acts, practices or omissions that were material, and that were likely to mislead consumers acting reasonably under the circumstances to the consumer's detriment, including but not limited to:

a. Defendants publicly claimed individuals should get Pfizer's vaccine to prevent transmission to others. Defendant Bourla participated in this conduct by personally making such claims himself, including statements cited above in December 2020, January 2021, June 2021, December 2021, and November 2023. Bourla, as CEO, also had direct control of, and authority to control and knowledge of, Pfizer's deceptive and unfair practices.

b. Defendants publicly claimed that Pfizer's COVID-19 vaccine was "safe," had "no safety concerns," and "not a single [safety] signal" across billions of doses. Defendant Bourla participated in this conduct by personally making such claims himself, including statements cited above in October 2020, November 2020, August 2021, September 2021, November 2021, and January 2023. Bourla, as CEO, also had direct control of, and authority to control and knowledge of, Pfizer's deceptive and unfair practices.

c. Defendants in fact knew that Pfizer's COVID-19 vaccine created a risk of myocarditis and pericarditis, especially among children.

d. Defendants had reason to believe that Pfizer's COVID-19 vaccine presented safety risks for pregnant women and their unborn babies in the first trimester and Pfizer lacked a reasonable basis to suggest otherwise.

e. Defendants in fact knew that Pfizer's COVID-19 vaccine was connected to many adverse events, including stroke and even death among elderly patients.

f. Defendants publicly claimed Pfizer was being transparent with its data about its COVID-19 vaccine when in fact it concealed such data.

154. When Defendants made statements directly to consumers about the benefits of a COVID-19 vaccine they failed to also tell them about its risks. To the contrary, Defendant Bourla publicly disparaged those who tried to raise risks as

"criminals." These omissions were unethical, unfair, and oppressive, and stole Floridians' ability to make informed choices about their health.

155. Through the actions and related business practices set forth in this Complaint, Defendants have engaged in acts or practices in trade or commerce that shock the conscience.

156. Through the actions and related business practices set forth in this Complaint, Defendants have engaged in acts or practices in trade or commerce that offend established public policy and are unethical, oppressive, unscrupulous, or likely to cause substantial injury to the reasonable consumer's right to make an informed choice.

157. Through the actions and related business practices set forth in this Complaint, Pfizer engaged in acts or practices that were likely to cause substantial injury to the reasonable consumer's right to make an informed choice, that was not reasonably avoidable by the consumers themselves, and that was not outweighed by countervailing benefits to consumers or competition.

158. Defendants thus engaged in deceptive, unfair, or unconscionable acts or practices in the conduct of trade or commerce in violation of Section 501.204(1), Florida Statutes.

159. Defendants are subject to civil penalties for willful violations of FDUTPA in the amount of Ten Thousand Dollars ($10,000) for each violation pursuant to Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000) for each violation that victimized or attempted to victimize a senior citizen

or a person who has a disability pursuant to Section 501.2077, Florida Statutes. Defendants are also subject to equitable remedies, including disgorgement, Section 501.207(3), Fla. Stat. Defendants' unlawful acts and practices were willful, repeated, and ongoing.

160. Defendants willfully engaged in and could continue to engage in deceptive, unconscionable, and unfair acts and practices in that Pfizer knew or should have known that the methods, acts, or practices alleged here were prohibited by law.

## COUNT II

### Violations of FDUTPA: Profiteering
### Chapter 501, Part II, Florida Statutes
### (Against All Defendants)

161. Plaintiff adopts, incorporates here, and re-alleges paragraphs 1 through 151 as if fully set forth here.

162. Beginning in 2020 and continuing until the present, Defendants engaged in unfair and unconscionable trade practices with respect to its business practices to obtain a larger share of the market for COVID-19 vaccines and the pricing of its COVID-19 vaccine.

163. Defendants engaged in unfair business practices to obtain a larger share of the market for Pfizer's COVID-19 vaccines, including but not limited to:

a. The deceptive and unfair statements and marketing described in this Complaint. Defendant Bourla participated by making these statements himself, as Pfizer's CEO he had direct control of such acts or practices and authority to control and knowledge of such acts or practices.

b. Pushing social media companies to silence any speech, across the political spectrum, that criticized Pfizer. Defendant Bourla had direct control and authority over these actions as CEO of Pfizer. Bourla also participated by, for example, condemning those critical of Pfizer as "criminals."

c. Quashing movements calling for patent and intellectual property sharing that would have allowed development of generic vaccines. Defendant Bourla had direct control and authority over these actions as CEO of Pfizer.

d. Funding efforts claiming its competitors' products caused cancer. Defendant Bourla had direct control and authority over these actions as CEO of Pfizer.

164. Pfizer then quadrupled the price of its COVID-19 vaccine in 2023. This price increase offended public policy and was immoral, unethical, oppressive, unscrupulous, substantially injurious to consumers, failed to provide offsetting benefits and could not be avoided by consumers. Pfizer chairman and CEO Dr. Bourla conceded that charging high prices for its COVID-19 vaccine would be "unethical." But that is precisely what Pfizer chose to do in 2023 after bringing in record-setting revenue in 2022. Defendant Bourla both participated in and had some measure of authority over and knowledge of the decision to quadruple prices in 2023. Bourla personally profited from Pfizer's record-setting profits, making $101,804,242.00 in total compensation from Pfizer from 2020 to 2023.

165. Through the actions and related business practices set forth in this Count and further described above, the Defendants have engaged in acts or practices in trade or commerce that shock the conscience.

166. Through the actions and related business practices set forth in this Count and further described above, the Defendants have engaged in acts or practices in trade or commerce that offend established public policy and are unethical, oppressive, unscrupulous, or likely to cause substantial injury to the reasonable consumer's right to make an informed decision.

167. Through the actions and related business practices set forth in this Complaint, Pfizer engaged in acts or practices in order to gain a larger portion of sales and engage in profiteering that were likely to cause substantial injury to the reasonable consumer's right to make an informed choice, that was not reasonably avoidable by the consumers themselves, and that was not outweighed by countervailing benefits to consumers or competition.

168. Defendants thus engaged in unfair acts or practices, or unconscionable acts or practices in the conduct of trade or commerce in violation of Section 501.204(1), Florida Statutes.

169. Defendants are subject to civil penalties for willful violations of FDUTPA in the amount of Ten Thousand Dollars ($10,000) for each violation under Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000) for each violation that victimized or attempted to victimize a senior citizen or a person who has a disability under Section 501.2077, Florida Statutes. Defendants are also

subject to equitable remedies, including disgorgement for their profiteering, Section 501.207(3), Fla. Stat. Defendants' unfair acts and practices were willful, repeated, and ongoing.

170. Defendants willfully engaged in and could continue to engage in the at-issue unfair and unconscionable acts and practices in that Defendants knew or should have known that the methods, acts, or practices alleged here were prohibited by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant it the following relief:

A. Enter a judgment for the Attorney General against Defendants for violations of FDUTPA.

B. Declare that Defendants' written and oral representations and omissions violated FDUTPA. §§ 501.207(1)(a), Fla. Stat.

C. Under Section 501.207(1)(b), Florida Statutes, enter a permanent injunction against Defendants that includes, but is not limited to, a permanent injunction from making deceptive and unfair representations and omissions to Florida consumers about Pfizer's COVID-19 vaccine.

D. Order Defendants to pay the Attorney General civil penalties of $10,000 for each violation of FDUTPA, Section 501.2075, Florida Statutes, and enhanced penalties of $15,000 for each violation that victimized a senior citizen or a person who has a disability, § 501.2077, Fla. Stat.

E. Award the Attorney General reasonable attorney's fees and reasonable costs, Sections 501.2075, 501.2105(1), Florida Statutes, and as otherwise allowable by applicable statutes or law.

F. Award such other and further relief as the Court deems just and proper, including all equitable relief allowed under Section 501.207(3), Florida Statutes, including, but not limited to, a monetary judgment for disgorgement.

Dated: October 1, 2026

Respectfully submitted,

JAMES UTHMEIER
*Attorney General*

RYAN D. NEWMAN
*Chief Deputy Attorney General*

JASON HILBORN
*Deputy Attorney General*
*Civil Division*

/s/ Jennifer Hayes Pinder

Victoria Ann Butler (FBN 861250)
*Director*
*Consumer Protection Division*
Victoria.Butler@myfloridalegal.com
Jennifer Hayes Pinder (FBN 017325)
*Bureau Chief, Tampa*
*Consumer Protection Division*
Jennifer.Pinder@myfloridalegal.com
3507 East Frontage Road, Suite 325
Tampa, Florida 33607
(813) 287-7950

James Otis Law Group, LLC

Michael C. Martinich-Sauter (*pro hoc vice forthcoming)*
Peter T. Reed (*pro hoc vice forthcoming)*
530 Maryville Centre Drive, Suite 230
St. Louis, Missouri 63141
(314) 897-5839
Michael.Martinich-Sauter@james-otis.com
Peter.Reed@james-otis.com

*Attorneys for Office of the Attorney General,*
*State of Florida, Department of Legal Affairs*

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR ST. LUCIE COUNTY, FLORIDA
CIVIL DIVISION

OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS

Plaintiff,

v.

PFIZER INC., a Delaware Corp.,
ALBERT BOURLA, an individual,

Defendants.

Case No. 562026CA002277AXXXHC

**SUMMONS**

**THE STATE OF FLORIDA**:
To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this: (1) this Summons, (2) Complaint, and (3) Civil Cover Sheet on Defendant:

PFIZER INC.
c/o C T CORPORATION SYSTEM, Registered Agent
1200 South Pine Island Road
Plantation, FL 33324

Each defendant is required to serve written defenses to the Complaint on **Jennifer Hayes Pinder**, plaintiff's attorney, whose address is:

Jennifer Hayes Pinder, Florida Bar No. 017325
Bureau Chief, Tampa
Office of the Attorney General
Department of Legal Affairs
3507 East Frontage Road, Suite 325
Tampa, Florida 33607
Telephone: 813-287-7950
Facsimile: 813-281-5515
Email: Jennifer.Pinder@myfloridalegal.com

within 20 days after service of this summons on that defendant, exclusive of the day

of service, and to file the original of the defenses with the clerk of this court either before service on plaintiff's attorney or immediately after service. A defendant may either file the response electronically by using the Florida Courts E-filing Portal (MyFLCourtAccess.com), or by filing the written response with the clerk of court. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the Complaint.

Dated on ______________

**Michelle R. Miller**
Clerk of the Circuit Court

By: _______________________

As Deputy Clerk

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Court Administration, 250 NW Country Club Drive, Suite 217, Port St. Lucie, FL 34986, (772) 807-4370 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

**SPANISH:** Si usted es una persona discapacitada que necesita algun tipo de adecuaci6n para poder participar de este procedimiento, usted tiene derecho a que se le ayude hasta cierto punto y sin costo alguno. Por favor comuniquese con Court Administration, 250 NW Country Club Drive, Suite 217, Port St. Lucie, Fl. 34986, (772) 807-4370, al menos 7 dias antes de su fecha de comparecencia o inmediatamente despues de haber recibido esta notificaci6n si faltan menos de 7 dias para su cita en el tribunal. Si tiene discapacidad auditiva o de habla, Harne al 711.

**KREYOL:** Si ou se yon moun ki andikape epi ou bezwen nenpot akomodasyon pou ou ka patisipe nan pwose sa-a, ou gen dwa, san ou pa gen pou-ou peye anyen, pou yo ba-ou yon seri de asistans. Tanpri

kontakte Court Administration, 250 NW Country Club Drive, Suite 217, Port St. Lucie FL 34986, (772) 807-4370 omwen 7 jou alavans jou ou gen pou-ou paret nan tribunal-la, ouswa imedyatman kote ou resevwa notifikasyon-an si ke li mwens ke 7 jou; si ou soud ouswa hebe, rele 711.

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR ST. LUCIE COUNTY, FLORIDA
CIVIL DIVISION

OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS

Plaintiff,

v.

PFIZER INC., a Delaware Corp., ALBERT BOURLA, an individual,

Defendants.

Case No. 562026CA002277AXXXHC

**SUMMONS**

**THE STATE OF FLORIDA**:
To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this: (1) this Summons, (2) Complaint, and (3) Civil Cover Sheet on Defendant:

ALBERT BOURLA
CEO, PFIZER INC.
66 Hudson Boulevard East
New York, NY 10001

Dated on ______________

**Michelle R. Miller**
Clerk of the Circuit Court

By: ________________________

As Deputy Clerk

**IMPORTANT**

1. A lawsuit has been filed against you.

2. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. If you choose to file a written response yourself, you may either file the response electronically by using the Florida Courts E-filing Portal (MyFLCourtAccess.com) or by filing the written response with the clerk of court.

3. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case.

4. If you do not file your response on time, you may lose the case, and your wages, money, and property may be taken without further warning from the court. There may be other legal requirements.

5. You may want to call an attorney right away. If you do not know an attorney, you can contact the Lawyer Referral Service listed on The Florida Bar's website (floridabar.org). If you cannot afford a lawyer, you may be eligible for free legal aid. You can locate legal aid programs by searching for "legal aid" on The Florida Bar's website.

6. If you file your written response directly with the clerk of court, you must also send a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below:

Jennifer Hayes Pinder, Florida Bar No. 017325
Bureau Chief, Tampa
Office of the Attorney General
Department of Legal Affairs
3507 East Frontage Road, Suite 325
Tampa, Florida 33607
Telephone: 813-287-7950
Facsimile: 813-281-5515
Email: Jennifer.Pinder@myfloridalegal.com

7. You must include an e-mail address in your written response, unless the clerk excuses you from electronic service under Florida Rule of General Practice and Judicial Administration 2.516. A party not represented by an attorney may be excused

from e-mail service by filing Florida Rule of General Practice and Judicial Administration form 2.601 with the clerk.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Court Administration, 250 NW Country Club Drive, Suite 217, Port St. Lucie, FL 34986, (772) 807-4370 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

**SPANISH:** Si usted es una persona discapacitada que necesita algun tipo de adecuaci6n para poder participar de este procedimiento, usted tiene derecho a que se le ayude hasta cierto punto y sin costo alguno. Por favor comuniquese con Court Administration, 250 NW Country Club Drive, Suite 217, Port St. Lucie, Fl. 34986, (772) 807-4370, al menos 7 dias antes de su fecha de comparecencia o inmediatamente despues de haber recibido esta notificaci6n si faltan menos de 7 dias para su cita en el tribunal. Si tiene discapacidad auditiva o de habla, Harne al 711.

**KREYOL:** Si ou se yon moun ki andikape epi ou bezwen nenpot akomodasyon pou ou ka patisipe nan pwose sa-a, ou gen dwa, san ou pa gen pou-ou peye anyen, pou yo ba-ou yon seri de asistans. Tanpri kontakte Court Administration, 250 NW Country Club Drive, Suite 217, Port St. Lucie FL 34986, (772) 807-4370 omwen 7 jou alavans jou ou gen pou-ou paret nan tribunal-la, ouswa imedyatman kote ou resevwa notifikasyon-an si ke li mwens ke 7 jou; si ou soud ouswa hebe, rele 711.

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR ST. LUCIE COUNTY, FLORIDA
CIVIL DIVISION

| | |
|---|---|
| OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS<br><br>Plaintiff,<br><br>v.<br><br>PFIZER INC., a Delaware Corp., ALBERT BOURLA, an individual,<br><br>Defendants. | Case No. 562026CA002277AXXXHC |

**SUMMONS**

**THE STATE OF FLORIDA**:
To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this: (1) this Summons, (2) Complaint, and (3) Civil Cover Sheet on Defendant:

PFIZER INC.
c/o C T CORPORATION SYSTEM, Registered Agent
1200 South Pine Island Road
Plantation, FL 33324

Each defendant is required to serve written defenses to the Complaint on **Jennifer Hayes Pinder**, plaintiff's attorney, whose address is:

Jennifer Hayes Pinder, Florida Bar No. 017325
Bureau Chief, Tampa
Office of the Attorney General
Department of Legal Affairs
3507 East Frontage Road, Suite 325
Tampa, Florida 33607
Telephone: 813-287-7950
Facsimile: 813-281-5515
Email: Jennifer.Pinder@myfloridalegal.com

within 20 days after service of this summons on that defendant, exclusive of the day

of service, and to file the original of the defenses with the clerk of this court either before service on plaintiff's attorney or immediately after service. A defendant may either file the response electronically by using the Florida Courts E-filing Portal (MyFLCourtAccess.com), or by filing the written response with the clerk of court. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the Complaint.

Dated on October 1, 2026

**Michelle R. Miller**
Clerk of the Circuit Court

By: ______________________

As Deputy Clerk

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Court Administration, 250 NW Country Club Drive, Suite 217, Port St. Lucie, FL 34986, (772) 807-4370 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

**SPANISH:** Si usted es una persona discapacitada que necesita algun tipo de adecuaci6n para poder participar de este procedimiento, usted tiene derecho a que se le ayude hasta cierto punto y sin costo alguno. Por favor comuniquese con Court Administration, 250 NW Country Club Drive, Suite 217, Port St. Lucie, Fl. 34986, (772) 807-4370, al menos 7 dias antes de su fecha de comparecencia o inmediatamente despues de haber recibido esta notificaci6n si faltan menos de 7 dias para su cita en el tribunal. Si tiene discapacidad auditiva o de habla, Harne al 711.

**KREYOL:** Si ou se yon moun ki andikape epi ou bezwen nenpot akomodasyon pou ou ka patisipe nan pwose sa-a, ou gen dwa, san ou pa gen pou-ou peye anyen, pou yo ba-ou yon seri de asistans. Tanpri

kontakte Court Administration, 250 NW Country Club Drive, Suite 217, Port St. Lucie FL 34986, (772) 807-4370 omwen 7 jou alavans jou ou gen pou-ou paret nan tribunal-la, ouswa imedyatman kote ou resevwa notifikasyon-an si ke li mwens ke 7 jou; si ou soud ouswa hebe, rele 711.

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR ST. LUCIE COUNTY, FLORIDA
CIVIL DIVISION

OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS

Plaintiff,

v. Case No. 562026CA002277AXXXHC

PFIZER INC., a Delaware Corp., ALBERT BOURLA, an individual,

Defendants.

## SUMMONS

**THE STATE OF FLORIDA**:
To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this: (1) this Summons, (2) Complaint, and (3) Civil Cover Sheet on Defendant:

ALBERT BOURLA
CEO, PFIZER INC.
66 Hudson Boulevard East
New York, NY 10001

Dated on October 1, 2026

**Michelle R. Miller**
Clerk of the Circuit Court

By: ______________________

As Deputy Clerk

**IMPORTANT**

1. A lawsuit has been filed against you.

2. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. If you choose to file a written response yourself, you may either file the response electronically by using the Florida Courts E-filing Portal (MyFLCourtAccess.com) or by filing the written response with the clerk of court.

3. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case.

4. If you do not file your response on time, you may lose the case, and your wages, money, and property may be taken without further warning from the court. There may be other legal requirements.

5. You may want to call an attorney right away. If you do not know an attorney, you can contact the Lawyer Referral Service listed on The Florida Bar's website (floridabar.org). If you cannot afford a lawyer, you may be eligible for free legal aid. You can locate legal aid programs by searching for "legal aid" on The Florida Bar's website.

6. If you file your written response directly with the clerk of court, you must also send a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below:

Jennifer Hayes Pinder, Florida Bar No. 017325
Bureau Chief, Tampa
Office of the Attorney General
Department of Legal Affairs
3507 East Frontage Road, Suite 325
Tampa, Florida 33607
Telephone: 813-287-7950
Facsimile: 813-281-5515
Email: Jennifer.Pinder@myfloridalegal.com

7. You must include an e-mail address in your written response, unless the clerk excuses you from electronic service under Florida Rule of General Practice and Judicial Administration 2.516. A party not represented by an attorney may be excused

from e-mail service by filing Florida Rule of General Practice and Judicial Administration form 2.601 with the clerk.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Court Administration, 250 NW Country Club Drive, Suite 217, Port St. Lucie, FL 34986, (772) 807-4370 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

**SPANISH:** Si usted es una persona discapacitada que necesita algun tipo de adecuaci6n para poder participar de este procedimiento, usted tiene derecho a que se le ayude hasta cierto punto y sin costo alguno. Por favor comuniquese con Court Administration, 250 NW Country Club Drive, Suite 217, Port St. Lucie, Fl. 34986, (772) 807-4370, al menos 7 dias antes de su fecha de comparecencia o inmediatamente despues de haber recibido esta notificaci6n si faltan menos de 7 dias para su cita en el tribunal. Si tiene discapacidad auditiva o de habla, Harne al 711.

**KREYOL:** Si ou se yon moun ki andikape epi ou bezwen nenpot akomodasyon pou ou ka patisipe nan pwose sa-a, ou gen dwa, san ou pa gen pou-ou peye anyen, pou yo ba-ou yon seri de asistans. Tanpri kontakte Court Administration, 250 NW Country Club Drive, Suite 217, Port St. Lucie FL 34986, (772) 807-4370 omwen 7 jou alavans jou ou gen pou-ou paret nan tribunal-la, ouswa imedyatman kote ou resevwa notifikasyon-an si ke li mwens ke 7 jou; si ou soud ouswa hebe, rele 711.